**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| KALEY WERDINE, | ) | |
| | ) | |
| Plaintiff, | ) | Cause No.: 3:21-cv-00597 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHIGAN CITY PUBLIC LIBRARY, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT FOR DAMAGES**
**AND REQUEST FOR JURY TRIAL**

Plaintiff, Kaley Werdine (hereinafter "Ms. Werdine"), by counsel, files this Complaint for Damages against Defendant, the Michigan City Public Library (hereinafter "the Library"), and states as follows:

**INTRODUCTION**

Ms. Werdine brings this action for compensatory damages against the Library. Despite successfully completing her job duties and maintaining good standing for more than two years, new supervisors began subjecting Ms. Werdine to disability-based discrimination in 2019. Ultimately, Ms. Werdine was constructively discharged from employment at the Library. As a direct result of the library's actions, Ms. Werdine suffered intense exacerbation of her mental health symptoms, causing her to attempt suicide on multiple occasions and resulting in her hospitalization in a mental health institution.

## PARTIES, JURISDICTION, AND VENUE

1.      Ms. Werdine is a resident of LaPorte County in the State of Indiana and a former employee of the Library.

2.      The Library is an employer as defined by 42 U.S.C. § 12101 *et seq.* and conducts business in LaPorte County in the State of Indiana.

3.      Ms. Werdine invokes this Court's federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).

4.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## GENERAL FACTS AND SPECIFIC ALLEGATIONS

5.      Ms. Werdine began working at the Library on or about January 4, 2017, and was employed as a Circulation Clerk II.

6.      Ms. Werdine is a qualified individual with a disability who, at all times relevant, was able to perform the essential functions of the job with or without reasonable accommodation.

7.      From January 2017 until April 2019, Ms. Werdine was supervised by Sarah Redden, the Head of Circulation, who granted Ms. Werdine several reasonable accommodations, including a part-time schedule and no work on Tuesdays and Wednesdays to accommodate medical appointments.

8.      After Ms. Redden retired in April 2019, the Library promoted Kayla Weiss to the role of Circulation Supervisor, and Ms. Weiss replaced Ms. Redden as Ms. Werdine's supervisor.

9.      The same month, Ms. Werdine provided Ms. Weiss a letter describing her mental illnesses and reasonable accommodations of part-time work and Tuesdays and Thursdays being reserved for therapy and doctor's appointments.

10.     On May 20, 2019, Ms. Werdine arrived several minutes late to her shift at the Library.

11.     Later that day, Ms. Weiss and Assistant Supervisor Effie Fowler confronted Ms. Werdine, at the Circulation Desk, about her tardiness.

12.     During this meeting, Ms. Werdine acknowledged their concerns and agreed to stay late. However, Ms. Weiss and Ms. Fowler continued to complain about Ms. Werdine's tardiness.

13.     During this conversation, Ms. Werdine felt attacked by Ms. Weiss and Ms. Fowler's confrontational measures, but was prevented from leaving.

14.     Ms. Weiss and Ms. Fowler confronted Ms. Werdine in public at the circulation desk and physically blocked her from leaving during this conversation.

15.     The confrontational and public nature of this meeting was very stressful and caused Ms. Werdine to cry at work. She took some time to step outside and calm down and then returned to her shift.

16.     On or around May 25, 2019, Ms. Weiss and Ms. Fowler again approached Ms. Werdine at the Circulation Desk, stating that she had been written up for insubordination in response to the May 20 incident.

17.     Ms. Weiss and Ms. Fowler reprimanded Ms. Werdine in public and in front of library patrons. The public nature of receiving this reprimand exacerbated Ms. Werdine's anxiety.

18.     When Ms. Weiss and Ms. Fowler began reviewing Library policies with Ms. Werdine, pursuant to the write-up, Ms. Werdine requested that the conversation be postponed so she could calm down and her grandmother, Dorothy Werdine (hereinafter "Ms. Werdine's grandmother"), could attend and serve as an emotional support.

19.     Ms. Fowler rejected Ms. Werdine's request for this reasonable accommodation, stating, "We don't give anyone special treatment."

20.     Ms. Weiss and Ms. Fowler then called Library Director Don Glossinger.

21.     When the call with Mr. Glossinger ended, the women informed Ms. Werdine that she was insubordinate, ordered her to leave immediately, and said she would lose wages for the hour remaining in her shift.

22.     Ms. Werdine was instructed that she was not to return to the Library until May 30, 2019, when she would attend a mandatory meeting with Mr. Glossinger.

23.     Prior to the May 30 meeting, Ms. Werdine obtained letters from her psychiatrist, Dr. Robert Reff, and psychologist, Dr. Patricia Mooney.

24.     These letters describe Ms. Werdine's disabilities and challenges responding to criticism, and recommend that the Library provide her with additional reasonable accommodations, including allowing Ms. Werdine's grandmother to attend any disciplinary meetings. Dr. Mooney also recommended that Ms. Werdine's supervisor engage with Ms. Werdine in a supportive manner and maintain an open dialogue with her.

25.     Ms. Werdine provided the letters from Drs. Reff and Mooney to Mr. Glossinger during the May 30 meeting.

26.     Mr. Glossinger, who attended the meeting with Assistant Director Andy Smith and Ms. Weiss, refused to allow Ms. Werdine's grandmother to attend.

27.     Mr. Glossinger gave Ms. Werdine written notice that she was suspended without pay. Additionally, he required that she provide the following medical information:

> We are requiring you to provide us, within 10 business days [sic] receipt of this letter, written verification from your doctor or other health provider, whose care you might be under, stating your diagnosis, and your prognosis as it applies to your

ability to perform as a condition of employment in your current position at Michigan City Public Library.

The notice specified that Ms. Werdine's employment would be terminated if this information was not timely provided to the Library.

28.     On or around June 3, 2019, Mr. Glossinger sent Ms. Werdine notice of another mandatory meeting, scheduled for June 7, 2019.

29.     Meanwhile, Ms. Werdine obtained a second letter from Dr. Reff, stating that she could complete the essential functions of her job if reasonably accommodated. Specifically, the letter said Ms. Werdine's disability-related aversion to stress and abrupt change could be mitigated by giving her a brief break to calm down in a quiet place, implementing change gradually, and permitting her grandmother's presence during disciplinary meetings.

30.     Ms. Werdine provided Mr. Glossinger with a copy of this letter during the June 7 meeting.

31.     The meeting on June 7, again included Mr. Glossinger, Mr. Smith, and Ms. Werdine. Mr. Glossinger would not allow Ms. Werdine's grandmother to attend.

32.     Mr. Glossinger began the meeting by announcing that Ms. Werdine was being transferred from her position working at the Circulation desk to the Maintenance Department, into a Maintenance III position.

33.     Job duties for the Maintenance III position included maintaining Library grounds, emptying trash cans, moving furniture, and other forms of physical, repetitive labor.

34.     Ms. Werdine's 20-hour workweek and pay rate remained in effect, although she was no longer permitted to have Tuesdays off to accommodate her therapy appointments. Instead, the Library agreed not to schedule Ms. Werdine on Wednesdays.

35.     Ms. Werdine objected to the transfer, but Mr. Glossinger stated that her only other option was termination of employment.

36.     Ms. Werdine was forced to choose between a transfer to Maintenance or termination at this meeting.

37.     Fearing termination more than the transfer, Ms. Werdine signed a document to consent to the transfer.

38.     June 11, 2019, was Ms. Werdine's first day in the Maintenance III position.

39.     Shortly thereafter, Ms. Werdine began suffering from the isolated nature of her work in the Maintenance Department. The absence of opportunities to regularly interact with co-workers and patrons exacerbated Ms. Werdine's mental health symptoms and worsened her depression.

40.     On or around July 30, 2019, Ms. Werdine wrote to Mr. Glossinger, describing her worsened mental health and again requested an opportunity to discuss her need for reasonable accommodations.

41.     One of the reasonable accommodations Ms. Werdine sought was transfer back to her Circulation Clerk II position. That position was vacant at the time.

42.     The following day, Mr. Glossinger replied that Ms. Werdine had already received a reasonable accommodation in the form of her transfer to the Maintenance Department.

43.     Working in the maintenance department was not a reasonable accommodation nor an appropriate position for Ms. Werdine.

44.     Glossinger declined to meet with Ms. Werdine and failed to engage in the interactive process. No other library staff met with Ms. Werdine on his behalf.

45.     On or around August 1, 2019, Ms. Werdine, by counsel, wrote to Mr. Glossinger, noting concerns with the Library's actions and seeking the opportunity to engage in the requisite interactive process under Title I of the Americans with Disabilities Act (ADA) to find a solution that would work for both Ms. Werdine and the Library.

46.     On or around August 23, 2019, the Library, by counsel, provided a written response that the Library would not be discussing potential reasonable accommodations for Ms. Werdine.

47.     Meanwhile, on June 14, 2019, Ms. Werdine requested leave from her job at the Library, pursuant to the Family and Medical Leave Act (FMLA), 29 U.S.C. 2601 *et seq*.

48.     The Library granted Ms. Werdine's request for FMLA leave on or around August 6, 2019, effective August 5 through September 16, 2019. The letter notifying Ms. Werdine of leave approval included notice that she would need to procure a fitness-for-duty certificate before returning to work.

49.     As the expiration of Ms. Werdine's FMLA leave drew closer, anxiety regarding her mental health increased.

50.     On or about September 3, 2019, Ms. Werdine wrote to Mr. Glossinger, reiterating her desire to work at the Library with appropriate, reasonable accommodations in place. She explained that, unless the Library would discuss reasonable accommodations prior to her return to work on September 16, she would consider herself constructively discharged.

51.     Neither Mr. Glossinger, nor any other agent of the Library, responded to Ms. Werdine.

52.     Ms. Werdine interpreted the Library's nonresponse as indicative of termination from employment.

53.     Plaintiff filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission (EEOC) wherein she alleged discrimination under the ADA, 42 U.S.C. § 12101, on or around November 1, 2019. It was identified as EEOC Charge No. 470-2020-00725.

54.     On or about November 2, 2020, the EEOC issued a Determination finding probable cause that the Library discriminated against Ms. Werdine by failing to provide her with reasonable accommodations.

55.     On or around May 18, 2021, the EEOC issued Ms. Werdine a Right to Sue Letter and Ms. Werdine timely filed this complaint.

**COUNT I**

56.     Plaintiff incorporates by reference paragraphs one (1) through fifty-five (55) of her complaint for damages.

57.     Plaintiff has multiple disabilities or perceived disabilities, as defined by the ADA. Specifically, she has diagnoses of Asperger's syndrome, attention deficit/hyperactivity disorder, bipolar disorder, a personality disorder, and depression.

58.     Defendant was aware of Plaintiff's disabilities and/or perceived Plaintiff as an individual with a qualified disability.

59.     Ms. Werdine was subjected to discrimination because of said disability.

60.     Plaintiff was able to perform the essential functions of her job, with or without reasonable accommodation.

61.     Defendant denied Plaintiff's repeated requests for reasonable accommodation and refused to engage in the interactive process with Plaintiff to discuss accommodations.

62.     Defendant's failure to engage in the interactive process is in direct violation of Plaintiff's rights under 42 U.S.C. § 12112(b)(5)(A).

63.     Rather than reasonably accommodate Plaintiff, Defendant transferred her from Circulation to the Maintenance Department. In doing so, Defendant engaged in "limiting, segregating, or classifying a[n] . . . employee in a way that adversely affects the opportunities or status of such a[n] . . . employee because of the[ir] disability," violating 42 U.S.C. § 12112(b)(1).

64.     When Plaintiff tried to transfer from the Maintenance Department to an open Circulation Clerk position, Defendant refused to consider her for the position. As such, Defendant's actions had the effect of "denying employment opportunities to a[n] . . . employee who is an otherwise qualified individual with a disability," as Defendant's denial was "based on the need of such covered entity to make reasonable accommodation to the . . . mental impairments of the employee," in violation of 42 U.S.C. § 12112(b)(4).

65.     Defendant further violated Plaintiff's rights by constructively terminating her employment. By refusing to reasonably accommodate Plaintiff's mental impairments, and knowing that Plaintiff could not continue working without requested reasonable accommodations, Defendant denied employment opportunities to an otherwise qualified employee with a disability.

66.     Defendant's actions and inactions are in violation of 42 U.S.C. § 12112(b)(5)(B).

67.     As a result of Defendant violating Plaintiff's rights, as protected under the ADA, Plaintiff sustained damages including, but not limited to, lost pay and benefits, medical bills, mental and emotional anguish, and attorneys' fees and costs.

## COUNT II

68.     Plaintiff incorporates by reference paragraphs one (1) through sixty-seven (67) above.

69.     Plaintiff suffered an exacerbation of mental health symptoms, due to the anxiety and stress induced in the workplace, and her mental health condition substantially declined upon her constructive termination from the Library.

70.     Plaintiff has attempted suicide on multiple occasions since being reprimanded by Ms. Weiss and Ms. Fowler on May 20, 2019. Plaintiff has also had periods of institutionalization for mental health treatment since her constructive termination on September 16, 2019.

71.     Defendant's negligent infliction of emotional distress upon Plaintiff is contrary to public policy and actionable under Indiana common law.

72.     As a result of Defendant's actions, Plaintiff has sustained damages including, but not limited to, extreme emotional distress, lost wages, and attorney's fees.

## **REQUEST FOR JURY TRIAL**

73.     Plaintiff, by counsel, respectfully requests that this cause be tried by a jury.

WHEREFORE, Plaintiff prays for judgment against Defendant, in an amount to fairly and adequately compensate Plaintiff for her extreme anguish and mental suffering, lost pay and benefits, damages, attorneys' fees and costs incurred herein, and for all other appropriate relief.

Respectfully submitted,

/s/ Emily Munson
Emily Munson (29025-49)
INDIANA DISABILITY RIGHTS
4701 North Keystone Avenue, Suite 222
Indianapolis, Indiana 46205
Telephone: 317-504-2578
Fax: 317-722-5564
emunson1@indianadisabilityrights.org

## CERTIFICATE OF SERVICE

On August 13, 2021, I served all parties by their attorneys of record by filing with the Court's CM/ECF system this **COMPLAINT FOR DAMAGES AND REQUEST FOR JURY TRIAL**. A copy was also mailed to Defendant's attorney of record by U.S. Mail to the following address:

Lyle Hardman
Hunt Suedhoff Kearney LLP
205 W. Jefferson Blvd.
Suite 300
South Bend, IN 46634

/s/ Emily Munson
Emily Munson (29025-49)